UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS


SAUL MARTINEZ, SARAH MARTINEZ,                )
ERIN DRUCTOR, Kathleen STEPHENS,              )
TRENT STEPHENS, SUMMER                        )   CASE NO.: _____
STEPHENS, RHETT STEPHENS,                     )
BRITTANI HOBSON, DEREK                        )
STEPHENS and ERIN DRUCTOR FOR                 )
THE ESTATE OF BLAKE STEPHENS,                 )   **JURY TRIAL DEMANDED**
JASON RZEPA, CASSANDRA RZEPA,                 )
ANN RZEPA, DAVID SHAIDELL, K.R., a            )
minor, C.R, a minor, MIRTHA POUNCE,           )
ROSA MILAGROS, YENY RAUDA,                    )
JASMYN RAUDA, EVELYN RAUDA,                   )
A.L.C, a minor, A.C., a minor, MIRTHA         )
POUNCE FOR THE ESTATE OF                      )
ROLAND CALDERON, JEAN REEVES,                 )
JAMES REEVES, MICHAEL REEVES,                 )
JARED REEVES, LESLIE                          )
HARDCASTLE, J.R., a minor, LESLIE             )
HARDCASTLE FOR THE ESTATE OF                  )
JOSHUA REEVES, CONSTANCE                      )
AHEARN, JAMES AHEARN SR., KEVIN               )
AHEARN, CONSTANCE AHEARN FOR                  )
THE ESTATE OF JAMES AHEARN,                   )
MARY NEIBERGER, RICHARD                       )
NEIBERGER, AMI NEIBERGER,                     )
ROBERT NEIBERGER, ERIC                        )
NEIBERGER, MARY NEIBERGER FOR                 )
THE ESTATE OF CHRIS NEIBERGER,                )
SAMANTHA GAGE, M.G, a minor,                  )
RANDY GAGE, TAMARA GAGE, JULIA                )
ROSE, SAMANTHA GAGE FOR THE                   )
ESTATE OF JOSEPH GAGE, YARISSA                )
TORRES, INDIVIDUALLY, AND FOR                 )
THE ESTATE OF TEODORO TORRES,                 )
CHARLENE WILCOX, BIANCA                       )
WILCOX, ONA WILCOX, CHARLES                   )
WILCOX III, CHARLENE WILCOX FOR               )
THE ESTATE OF CARLOS WILCOX,                  )
CHERYL ANAYA, TRISTA MOFFETT,                 )
CARMELO ANAYA JR., CHERYL                     )
ANAYA FOR THE ESTATE OF                       )

1

MICHAEL ANAYA, CHELSEA ADAIR,                )
A.A., a minor, CHELSEA ADAIR FOR             )
THE ESTATE OF JAMES ADAIR, JOHN              )
TAKAI, MAE TAKAI, PATRICIA L.                )
CRUZE, JUAN L. TAKAI, JOLEAN                  )
TAKAI, J.T.,  a minor, N.T., a minor, K.T, a  )
minor, I.T, a minor, JERMAINE TAKAI,         )
BETTY JEAN KLINE, JOHN KLINE JR.,            )
BETTY JEAN KLINE FOR THE ESTATE              )
OF KEITH KLINE, LOUIS DAHLMAN,               )
KAY STOCKDALE, TIA MIXON, T.R.M.,            )
a minor, MELINDA MIXON, WALTER               )
MIXON, KENNETH MIXON, KIMBERLY               )
SPILLYARDS, TIA MIXON FOR THE                )
ESTATE OF JUSTIN MIXON, KAREN                )
HUFFMAN, GARY HUFFMAN, KAREN                 )
HUFFMAN FOR THE ESTATE OF                    )
JASON HUFFMAN, MARIA VAZQUEZ,                )
individually and for THE ESTATE OF           )
OMAR VAZQUEZ, DORIS BENNETT,                 )
DEMPSEY BENNET, DARNELL                      )
BENNETT, DORIS BENNET FOR THE                )
ESTATE OF DURRELL BENNETT,                   )
DEBBIE OTTE, DAVID KUBE,                     )
JONATHAN KUBE, JESSICA KUBE,                 )
JASON KUBE, JENNIFER KUBE, DAVID             )
KUBE FOR THE ESTATE OF                       )
CHRISTOPHER KUBE, WENDY GREEN,               )
J.W., a minor, CHAD WEIKEL, WENDY            )
GREEN FOR THE ESTATE OF IAN                  )
WEIKEL, GARY L. HENRY,                       )
INDIVIDUALLY AND ON BEHALF OF                )
THE ESTATE OF GARY HENRY, and               )
ANTHONY LILL, CHARMAINE LILL,                )
SKYE OTERO, C.L, a minor, M.L., a            )
minor, ANTHONY LILL AND ON                   )
BEHALF OF THE ESTATE OF ERIC                 )
LILL.                                         )
                              Plaintiffs,    )
                                             )
              v.                             )
                                             )
DEUTSCHE BANK AG, HSBC                       )
HOLDINGS PLC, HSBC BANK PLC,                 )
HSBC BANK MIDDLE EAST LIMITED,              )
HSBC BANK USA, N.A., BARCLAYS                )
BANK PLC, STANDARD CHARTERED                 )

2

BANK, ROYAL BANK OF SCOTLAND, )
N.V., CREDIT SUISSE AG, BANK )
SADERAT PLC, COMMERZBANK AG, )
AND JOHN DOES 1-50 )

Defendants.

**COMPLAINT**

## I. NATURE OF THE ACTION

1. This is a civil action authorized pursuant to 18 U.S.C. § 2333(a) by American nationals and/or their families for treble damages against six Western international banks (Defendants) who knowingly supported the nation of Iran and its banking agents (including Defendant Bank Saderat Plc, Bank Melli Iran, the Central Bank of Iran ("CBI"), Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah) by evading U.S. economic sanctions, conducting illicit trade-finance transactions, and disguising financial payments to and from U.S. dollar-denominated accounts.

2. As a result, Plaintiffs will show that each Defendant knew, or was deliberately indifferent to the fact, that Iran was thus able to provide material support and resources to designated foreign terrorist organizations which engaged in terrorist activity in violation of 18 U.S.C. §2339B(a)(1); and knowing or having reasonable cause to know that a country (Iran) is supporting "international terrorism," engaged in financial transactions with that country in violation of 18 U.S.C. § 2332d.   Plaintiffs will show that each Defendant's specific aims and objectives was keeping U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system.

3.

## II.     BACKGROUND- IRAN

### A.     IRAN'S STATE-SPONSORED FINANCING OF TERRORISM

4.     Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings and assassinations across the globe.

5.     The United States designated Iran a State Sponsor of Terrorism on January 19, 1984. That designation has remained in force throughout the relevant time period to this Action.

### B.     SANCTIONS AND IRAN'S RELIANCE ON U.S. DOLLARS

6.     Since its 1984 designation, the United States has attempted to constrain and deter Iran's sponsorship and conduct of terrorist activities, as well as its development of Weapons of Mass Destruction, by imposing a wide variety of trade and economic sanctions intended  to reduce the flow of financial resources, especially U.S. dollar-denominated assets, for Iran's support of such activities.

7.     To ensure that U.S. financial institutions that process international wire transfers in the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and are) required to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

8.     Banks in New York that process most of the world's Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system

to fund or otherwise engage in terrorism and other prohibited conduct.

9.      At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originate from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.

10.      Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, and to fuel its other terrorism and weapons proliferation activities through the IRGC.

11.      The importance to Iran of funding terrorist organizations, described below, became even more acute after the 2003 U.S. invasion of Iraq. After that event, Iran directed Hezbollah to create "Unit 3800" (discussed below) and began devoting greater financial resources to gain influence in Iraq, inflict casualties on American citizens in Iraq, and intensify its quest for weapons of mass destruction.

12.      None of these goals could be accomplished by Iran without USD funds, access to the Eurodollar market, and the agreement of Western financial institutions, such as the Western Bank Defendants, to shield Iran's unlawful Eurodollar and trade-finance activities from detection.

### C.      IRAN CONTINUALLY EVADED U.S., EUROPEAN UNION AND UNITED NATIONS SANCTIONS

13.      Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell Weapons of Mass

Destruction technology and military equipment to Iran.

14.    On March 16, 1995, as a result of Iranian sponsorship of international terrorism and Iran's active pursuit of Weapons of Mass Destruction, President Clinton issued Executive Order 12957 prohibiting U.S. involvement with petroleum development in Iran.

15.    On May 6, 1995, President Clinton signed Executive Order 12959, pursuant to the International Emergency Economic Powers Act ("IEEPA"),  as well as the 1985 International Security and  Development Cooperation  Act  ("ISDCA"),  substantially tightening  sanctions against Iran.

16.    On August 19, 1997, President Clinton signed Executive Order 13059 clarifying Executive Orders 12957 and 12959, and confirming that virtually all trade and investment activities with Iran by U.S. persons, wherever located, were prohibited.

17.    In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea.

18.    In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

19.    For years, U.S. law enforcement officials, customs agents and intelligence services have worked to thwart Iranian efforts to circumvent U.S. economic sanctions and arms embargos.

### D.  IRANIAN SPONSORED TERRORIST ORGANIZATIONS

20.    The Defendant's actions foreseeably enabled Iran and its agents to provide a combination of funding, weapons, munitions, intelligence, logistics, and training to the Hezballah, and the Islamic Revolutionary Guard Corps ("IRGC"), each of whom are U.S. designated Foreign

Terrorist Organizations; an IRGC directorate known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"), and Iran's terrorist agents (including a litany of Iraqi Shi'a terror groups referred to herein collectively as the "Special Groups").

21.     These Special Groups killed, injured, or maimed the Plaintiffs and/or their family members in Iraq from 2004 to 2011.

22.     The specific attacks alleged herein were all carried out by terrorist organizations and entities like Hezbollah and the Special Groups, not by armed forces of recognized governments or military forces, and thus the injuries sustained were not the result of, or in the course of a declared war with Iran, or armed conflict between the United States and Iran. "The United States has never authorized the use of military force against Iran, nor has the United States ever been in an armed conflict with the Republic of Iran."

23.     Preceding the attacks alleged herein, President Bush declared that all major combat operations in Iraq had ended, on May 1, 2003. Similarly, the United Nations Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003.

24.     Iran has had a long, deep, strategic partnership with the Lebanese-based designated Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

25.     Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans, in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty- nine

people) and the 1994 bombing of a Jewish community center (killing eighty five people).

26.     As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a Specially Designated Terrorist ("SDT") by the United States.

27.     On October 8, 1997, Hezbollah was designated an FTO by the United States. It has retained that designation since that time. On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated an SDGT by the United States. For more than 30 years, Iran, through the IRGC, has funded, trained and equipped Hezbollah.

28.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade EFPs, anti-tank guided missiles ("ATGMs"), and various rockets.

29.     The acts of the IRGC, IRGC-QF, Hezbollah, and/or the Special Groups that injured the Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. §2331, involving violent acts intended to influence the United States by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and also were acts engaging in terrorist activities within the meaning of 8 U.S.C. §1182(a) (3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

30.     The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

31.     The United States designated Hezbollah a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) in 1997.  The designation has remained in effect since that time.

32.     In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") as a FTO stating that the Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.

33.     Formally, the IRGC is a subordinate directorate of MODAFL, but in practice, it has substantial autonomy from MODAFL. The IRGC, however, uses MODAFL to both procure and develop weapons and equipment for its use.

34.     In October 2007, the United States designated the IRGC-QF a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order ("E.O.") 13324, explaining that the Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities,  providing it  with  guidance, funding, weapons, intelligence, and logistical support.  In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

34.     In October 2007, Defendant Bank Saderat Plc, together with its parent company Bank Saderat Iran, was designated an SDGT by the United States pursuant to E.O. 13224.

35.     The U.S. Treasury Department's 2007 press release regarding Bank Saderat's designation stated Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC,

and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

36.    The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF in that Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

37.    Mahan Air was also later identified as the conduit to Iran of thousands of radio frequency modules recovered by Coalition Forces in Iraq from Improvised Explosive Devices ("IEDs") that were used to target U.S. and Coalition Forces.

38.    As noted by the U.S.  Treasury Department's Financial Crimes Enforcement Network ("FinCEN") in a March 20, 2008 advisory: "Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."

### E.   DEFENDANTS KNEW, OR WERE DELIBERATELY INDIFFERENT TO THE FACT, THAT ASSISTING IRAN LAUNDER MONEY THROUGH THE UNITED STATES FINANCIAL SYSTEM PROVIDED MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS

38.    The named Defendants herein are Deutsche Bank AG, HSBC Holdings Plc, HSBC Bank Plc ("HSBC- London"), HSBC Bank Middle East Ltd., HSBC Bank USA, N.A. (referred to herein collectively as  the  "HSBC Defendants"); Barclays Bank Plc ("Barclays"); Standard Chartered  Bank ("SCB"); Royal Bank of Scotland N.V. (referred to herein as "ABN Amro" or "RBS N.V."); Credit  Suisse AG ("Credit  Suisse"); Bank Saderat Plc; Commerzbank AG

("Commerzbank") and John Does 1-50.

39.     Each Defendant conspired with Iran to evade U.S. economic sanctions and arms embargos against Iran knowing, or deliberately indifferent to the fact, that Iran would use some of the funds it laundered through the United States to finance the IRGC, IRGC-QF, and Hezbollah for the purpose of killing and maiming, *inter alia*, American citizens serving as part of the Coalition Forces in Iraq from 2004 to 2011.

40.     Defendants conspired with others to engage in an  illegal  criminal agreement, beginning in 1987 and, on information and belief, continuing to the present, between Iran, its banking agents and various international financial institutions by and through which Defendants knowingly participated in a criminal scheme in which they agreed to alter, falsify, or omit information from bank-to-bank payment orders sent on the SWIFT private financial messaging network ("SWIFT-NET") operated by the Society for Worldwide Interbank Telecommunication ("SWIFT-Brussels") that involved Iran or Iranian parties (including several Iranian banks (referred to herein collectively as the "Iranian Bank Co-conspirators") such as Bank Melli Iran, Bank Saderat Iran, the CBI, Bank Mellat, Bank Tejarat, Bank Refah and Bank Sepah, as well as the Islamic Republic of Iran Shipping Lines ("IRISL"), the National Iranian Oil Company ("NIOC") and Mahan Air) that serve as financial and logistical conduits for the IRGC and its terrorist activities.

41.     The aims and objectives of this conspiracy, all of which were foreseeable to the Defendants,  included, among others:

        a.      Concealing Iran's dollar-denominated financial activities and transactions from detection, scrutiny,  or  monitoring  by  U.S. regulators, law enforcement, and/or depository institutions;

b.   Facilitating illicit transactions totaling at least $50 million USD for the benefit of Hezbollah;

c.   Facilitating illicit transactions totaling at least $100 million in USD funds for the direct benefit of the IRGC and billions in USD funds for the benefit of the NIOC, then controlled by the IRGC;

d.   Facilitating at least hundreds of illicit transactions totaling more than $60 million on behalf of IRISL, including over 150 "stripped" transactions after IRISL was designated an SDN;

e.   Facilitating tens of millions of dollars in illicit transactions on behalf of MODAFL, the IRGC, Mahan Air and other instrumentalities of Iranian state-sponsored terror to further numerous violations of the U.S. trade embargo against Iran, conceal Iran's efforts to evade U.S. sanctions and enable Iran's acquisition from the United States of goods and technologies prohibited by U.S. law to be sold or transferred to Iran, including components of IEDs deployed against Coalition Forces in Iraq; and

f.   Enabling Iran, the Iranian Bank Co-conspirators (including Defendant Bank Saderat Plc), the IRGC, Hezbollah, and the Special Groups to plan for, conspire to, and perpetrate acts of international terrorism under 18 U.S.C. § 2331(1); homicides, attempted homicides, or conspiracies to commit homicide under 18 U.S.C. § 2332(a)-(c); bombings using destructive devices

under 18 U.S.C. § 2332a; bombings and attempted bombings under 18 U.S.C. § 2332f; engaging in terrorist activity under 8 U.S.C. § 1189(a)(3)(B)(iii)-(iv); and/or engaging in terrorism under 22 U.S.C. § 2656f.

42.   Although the conspiracy was effectuated in a variety of ways, four primary techniques were used by Iran acting in concert with both the Iranian Bank Co-conspirators, MODAFL, the IRGC, IRISL and the Defendants herein:

a.   The Defendants removed or altered the names, Bank Identifier Codes ("BICs"), and other identifying information of the Iranian Bank Co- conspirators or Iranian counter-parties in the payment orders sent through U.S. correspondent banks via SWIFT-NET– a practice commonly known and referred to as "stripping" SWIFT-NET messages;

b.   The Defendants converted ordinary transactions involving SWIFT-NET message type 103 ("MT 103") payment orders (that would disclose the details of the counter-parties to the transactions) into bank-to-bank transfers known as SWIFT-NET message type 202 ("MT 202") payment orders (that did not require the transmitting bank to include information disclosing the originator, beneficiary, and counter-parties), for the specific purpose of concealing the origin and destination of Iranian funds transfers;

c.   The Defendants deliberately chose not to conduct the required screening of Iran-linked SWIFT-NET messages and letters of credit documents, worth at least tens of millions in USD funds on an annual basis, for compliance with the U.S. Office of Foreign Assets Control ("OFAC") list of SDNs; the U.S. State

Department's United States Munitions List ("USML") of defense-related export controlled items; and/or the U.S. Bureau of Industry and Security's ("BIS") Commerce Control List ("CCL") of dual-use export controlled items, and Denied Persons List ("DPL") of export denied entities; and

d.       The Defendants knowingly and willfully facilitated the illicit export and import of Iranian petroleum products for the NIOC and other sanctioned Iranian entities. These petrodollar transactions, including trade-finance and foreign exchange, provided Iran with illegal access to billions of dollars, including the direct funding of the IRGC and its network of front companies.

43.     Each of the Defendants directly conspired with Iran through Defendant Bank Saderat Plc, Bank Melli Iran, the CBI and others, to facilitate the conspiracy; and was aware of the existence and participation of other co-conspirators, including other Defendants named herein.

44.     In fact, on numerous occasions, three or more of the Defendants acted jointly to facilitate the same illegal trade-finance transaction (*e.g.* providing material assistance to Mahan Air because the Iranian airline wanted to purchase U.S. manufactured aircraft and needed help circumventing U.S. export restrictions against Iran).

45.     Each of the Defendants knew or was deliberately indifferent to the fact that Iran was a U.S.-designated State Sponsor of Terrorism, and knew or was deliberately indifferent to the fact Iran was clandestinely routing billions of dollars through the United States to hide its unlawful conduct; and each Defendant took affirmative steps to help Iran in its unlawful conduct.

46.     Each of the Defendants also knew, or was deliberately indifferent to, the fact

that Iran, as a U.S.-designated State Sponsor of Terrorism, would (and, in fact, did) channel hundreds of millions of the dollars that Defendants helped launder and conceal from U.S. regulators and law enforcement agencies to the IRGC and Hezbollah.

47.     Each of the Defendants also knew, or was deliberately indifferent to, the well-publicized fact that Iran and its terror proxies were killing and maiming American civilians and servicemen in Iraq, and that U.S. nationals would foreseeably be injured or killed as a result of the substantial assistance those dollars provided to the IRGC and Hezbollah.

48.     Each of the Defendants also knew, or was deliberately indifferent to, the foreseeable (and inevitable) consequences of providing Iran, a State Sponsor of Terrorism, with access to hundreds of *billions* of dollars of concealed payments and the resulting funding of Iranian-controlled organizations and terrorism proxies that targeted American civilians and servicemen through acts of international terrorism in Iraq from 2004 to 2011.

49.     Absent the criminal collusion and conspiratorial conduct of Defendants, Iran and its agents—including the IRGC, IRISL, and NIOC; and Banks Melli, Sepah, Refah, Mellat and Saderat—could not have successfully hidden the volume of U.S. dollar clearing and trade-finance transactions that they succeeded in illegally clearing through the United States in U.S. dollars.

50.     Iran's objectives were not secret. Its pursuit and development of Weapons of Mass Destruction—including mines and similar explosive munitions—were the subject of hundreds of news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.

51.     Beginning in September 2006, the U.S. Treasury and State Departments launched a campaign to warn 40 major international banks and financial institutions about the

risks of conducting business with the Iranian government, particularly targeting financial transactions involving the IRGC.

52.    According to the March 26, 2007 edition of *The Washington Post*, Defendants Standard Chartered Bank, Commerzbank and the HSBC Defendants were among those briefed by U.S. government officials about the dangers posed (in terms of both proliferation and terror financing) in conducting business with Iran.

53.    On April 19, 2007, the Wolfsberg Group, an association of twelve global banks whose stated aim is to develop financial services industry standards, issued a statement "endorsing measures to enhance the transparency of international wire transfers to promote the effectiveness of global anti-money laundering and anti-terrorist financing programs."   The measures include both the development of an enhanced payment message format, which would include more detailed information about those conducting wire transfers in certain instances, as well as calling for the global adoption of basic messaging principles aimed at promoting good practice with respect to the payment system." This statement was directed to the increasingly apparent risks inherent in MT 202 "cover payments" – one of the methods Defendants used to conceal their illegal USD funds transfers on behalf of Iran through the Eurodollar market.

54.    Defendants Barclays, Credit Suisse, and HSBC were all members of the Wolfsberg Group, and were listed on the 2007 press statement.

55.    On September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the

summer, the official said.

56.     Without the active participation of the Defendants, Iran could not have transferred the same volume of USD to the IRGC and Hezbollah, nor could it have done so with the same ease and efficiency.

57.     Without the active participation of the Defendants, Iran could not have successfully violated U.S. export controls, financed its illicit arms shipments or manufactured the same volume and sophistication of factory-grade Explosively Formed Penetrators ("EFPs") to kill and maim Americans in Iraq.

58.     The transfers of hundreds of millions of dollars by Iran to the IRGC and Hezbollah and the provision of material support to the IRGC and Hezbollah was the natural and reasonably foreseeable consequence of the Defendants' unlawful agreement to help Iran launder money through the United States financial system.

59.     IRISL did facilitate shipments of military cargo to Hezbollah, one of the organizations responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs.

## III.     JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2333(a) as a civil action brought by citizens of the United States and/or their estates, survivors, or heirs, who have been injured by reasons of acts of "international terrorism," as such term is defined in 18 U.S.C. § 2331(1).   Violations of 18 U.S.C. § 2339B have been recognized as "acts of international terrorism" under §2333(1). Violations of §2332d require financial transactions with countries, such as Iran, supporting "international terrorism" and thus constitute "acts of international terrorism" under §2333(1). Both Federal and Illinois law provide

for personal jurisdiction over the defendants, each can be found in Illinois or have agents throughout.  As the attached exhibits demonstrate, the defendants directed their criminal activity at United States depository institutions in New York and throughout the United States. The defendants were aware of their activity directed at United States banks, repeated over time. This contact comports with Constitutional Due Process, as contacts with the forum demonstrate that the defendants purposefully availed themselves of the United States banking system throughout the United States, and understood that they could be hailed into court here.  Illinois has a strong interest in protecting its citizens and the United States financial system from the criminal activity alleged herein.

61.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a); and 28 U.S.C. §§1391(b) and 1391(d). HSBC Defendants are found, have agents and transact their affairs in this judicial district. On information and belief, those activities include HSBC Defendants owning and leasing property related to bank branches within the judicial district, having agents and employees at bank branches located within the judicial district and conducting transactions involving credit cards and mortgage and other loans with consumers located within the judicial district. Specifically, HSBC Defendants have foreclosed on properties located within this judicial district, taking title to the property and using courts located within the district to complete the foreclosure proceedings.  HSBC has paid taxes on properties it owns in the district, including St. Clair County, Illinois.  HSBC has paid fines for failing to maintain real property that it possess in the district, including in Madison County, Illinois.  HSBC regularly retains agents to conduct and maintain its regular business in the district.

62.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2).  Defendant HSBC Bank USA,

N.A. is also subject to personal jurisdiction under CPLR § 301. Defendants' unlawful conduct was purposefully directed at the United States, and the conspiracy was specifically designed to effectuate the flow of billions of USD through the United States in violation of U.S. laws, and in fact resulted in hundreds of billions of dollars illegally passing through the United States.

## IV.   THE DEFENDANTS

### A.   THE HSBC DEFENDANTS

63.    Defendant HSBC Holdings Plc ("HSBC Holdings") is a public limited company organized under the laws of the United Kingdom. HSBC Holdings directly or indirectly owns, *inter alia*, Defendant HSBC Bank Plc, Defendant HSBC Bank Middle East Limited, and Defendant HSBC Bank USA, N.A. (as noted above, referred to herein collectively as the "HSBC Defendants"). HSBC Holdings is occasionally referred to internally (and in this Complaint) as "HSBC Group," or "The Group," and members and affiliates of HSBC Holdings (including the named HSBC Defendants herein) are occasionally referred to herein as "HSBC Group members."

64.    Defendant HSBC Holdings constitutes the ultimate parent company of one of the world's largest banking and financial services groups with approximately 6,300 offices in over 75 countries and territories.

65.    HSBC Holdings is listed on the New York Stock Exchange ("NYSE"), London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

66.    HSBC Group members comprise financial institutions throughout the world that are owned by various intermediate holding companies, and ultimately, but indirectly, by Defendant HSBC Holdings, which, as alleged above, is incorporated and headquartered in England.

67.     Defendant HSBC Bank Plc ("HSBC-London," often referred to internally by members of HSBC Group as "HBEU") is a financial institution registered under the laws of England and Wales.

68.     Defendant HSBC Bank Middle East Limited ("HSBC-Middle East," often referred to internally by members of HSBC Group as "HBME"), is a financial institution registered under the laws of the Jersey Channel Islands.

69.     Defendant HSBC Bank USA, N.A. ("HSBC-US," often referred to internally by members of HSBC Group as "HBUS"), is a national bank chartered under the National Bank Act (12 U.S.C. § 2 *et seq.*) that constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

70.     According to the fact sheets published on HSBC-US's official website, HSBC- US's headquarters are in McLean, VA, and it has its principal office in New York City.

71.     HSBC-US operates numerous bank branches throughout the United States.

72.     HSBC-US is the principal subsidiary of HSBC USA Inc., which is, in turn, an indirect, wholly-owned subsidiary of HSBC North America Holdings, Inc. ("HNAH"). HNAH's businesses serve customers in retail banking and wealth management, commercial banking, private banking, and global banking and markets.

**B.     DEFENDANT BARCLAYS BANK PLC**

73.     Defendant Barclays Bank Plc ("Barclays") is a global financial services provider headquartered in London, United Kingdom.

74.     Defendant Barclays is a wholly-owned subsidiary of Barclays Plc, a public limited liability company organized under the laws of England and Wales.

75.     As used in this Complaint, "Barclays" refers to Barclays Bank Plc, the wholly- owned subsidiary of Barclays Plc, not Barclays Plc, Defendant Barclays Bank Plc's parent company.

76.     Barclays is one of the largest banks in the world. Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").

77.     At all relevant times, Barclays maintained a New York branch ("Barclays-NY") that functioned as the primary U.S. dollar funds clearer for all of Barclays, its affiliates, and its customers. The branch thus constitutes a "U.S. person" under the definitions set forth in §560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

## C.     DEFENDANT STANDARD CHARTERED BANK

78.     Defendant Standard Chartered Bank ("SCB") is one of the world's largest international banks, with over 1,700 branches, offices, and outlets in more than 70 countries. Headquartered in London, SCB operates principally in Asia, Africa, and the Middle East, and has operations in consumer, corporate and institutional banking, and treasury services. SCB-London is listed on the London Stock Exchange ("LSE") and Hong Kong Stock Exchange ("SEHK").

79.     Since 1976, SCB has had a license issued by the state of New York to operate as a foreign bank branch in New York, New York ("SCB-NY"). The branch provides wholesale banking services, primarily U.S.-dollar clearing for international wire payments.

80.     Standard Chartered's New York branch is the seventh largest U.S. dollar correspondent bank in the world, clearing and settling approximately 195 billion in USD funds per day.

81.     Standard Chartered's New York branch also constitutes a "U.S. person" under

the definitions set forth in § 560.314 of the ITR and 18 U.S.C. § 2332d(b)(2).

      **D.**      **DEFENDANT ROYAL BANK OF SCOTLAND N.V.**

     82.     In October 2007, a consortium consisting of Fortis, the Royal Bank of Scotland Group ("RBS"), and Banco Santander acquired ABN Amro Holding N.V., the parent company of ABN Amro Bank N.V., using the acquisition vehicle RFS Holdings.

     83.     The former ABN Amro Bank N.V. subsequently underwent a restructuring process to transfer its Dutch State-acquired businesses and activities out of the existing ABN Amro Group. To do so, the relevant Dutch State-acquired businesses were first transferred to a new legal entity owned by ABN Amro Holding N.V.

     84.     On February 5, 2010, through a statutory demerger process, the former ABN Amro Bank N.V. was renamed RBS N.V.

     85.     Ultimately, RBS acquired ABN Amro Holding N.V. As such, RBS acquired the New York and Chicago branches of ABN Amro Bank N.V. and began integrating certain business lines handled by these branches into its other U.S. operations. These former branches constitute a "U.S. person" under the definitions set forth in § 560.314 of the ITR and 18 U.S.C. §2332d(b)(2).

     86.     In this Complaint, "ABN Amro (RBS N.V.)" refers to the named Defendant herein.

      **E.**      **DEFENDANT CREDIT SUISSE AG**

     87.     Defendant Credit Suisse AG ("Credit Suisse") is a financial services company headquartered in Zurich, Switzerland. Its U.S. headquarters are located at 11 Madison Avenue, New York, New York.

     88.     Credit Suisse serves clients worldwide through its Private Banking unit, which

includes a Wealth Management and Corporate & Institutional Clients unit; Investment Banking unit; and Asset Management unit.

89.     According to the CHIPS-NY website, Credit Suisse used the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

> a.    Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);
>
> b.    The Bank of New York Mellon (identified by CHIPS-NY participant number 0001 and Fedwire routing number 011001234);
>
> c.    Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033); and
>
> d.    Wells Fargo Bank NY International (identified by CHIPS-NY participant number 0509 and Fedwire routing number 026005092).

Credit Suisse's New York branch is subject to oversight and regulation by the Board of Governors of the U.S. Federal Reserve System and the New York State Banking Department. The branch thus constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

### F.    DEFENDANT BANK SADERAT PLC

90.     Bank Saderat Iran is one of the largest banks in Iran. It has approximately 3,400 offices worldwide, including, as discussed below, a United Kingdom subsidiary (Defendant Bank Saderat Plc), and branches in Frankfurt, Paris, Athens, Dubai and Beirut.

91.     Bank Saderat Iran was nationalized after the Iranian Revolution, but allegedly privatized in 2009. According to Bank Saderat Iran, 49% of its shares are owned by the Iranian government, but it is technically a non-governmental entity.

92.     In 2002, Bank Saderat Iran's London bank branch became a wholly-owned bank subsidiary, incorporated under United Kingdom law (*i.e.* Defendant Bank Saderat Plc).

Bank Saderat Plc is the legal successor in interest to the Iran Overseas Investment Bank ("IOIB"), London.

93.     IOIB changed its name to Bank Saderat Plc in March 2002.  Defendant  Bank Saderat Plc maintains its principal office in London, United Kingdom.

### G.     DEFENDANT COMMERZBANK AG

94.     Defendant Commerzbank AG ("Commerzbank") is a financial services company headquartered in Frankfurt, Germany, and has over 1,200 branches in Germany alone.

95.     According to the CHIPS-NY website, Commerzbank AG used, *inter alia,* the following U.S. financial institutions in New York to clear and settle its Eurodollar transactions:

   a.     Defendant Commerzbank's New York branch (identified by CHIPS-NY participant number 0804 and Fedwire routing number 026008044);
   b.     Defendant HSBC Bank USA, N.A. (identified by CHIPS-NY participant number 0108 and Fedwire routing number 021001088);
   c.     Defendant SCB-NY (identified by CHIPS-NY participant number 0256 and Fedwire routing number 026002561); and
   d.     Deutsche Bank Trust Co Americas (identified by CHIPS-NY participant number 0103 and Fedwire routing number 021001033).

Commerzbank maintains 23 foreign branches, including a New York branch licensed by the State of New York since 1967.

96.     The New York branch of Commerzbank constitutes a "U.S. person" under the Iranian Transaction Regulations and § 2332d(b)(2).

97.     Commerzbank is listed on stock exchanges in Germany, London, and Switzerland.

### H.     DEFENDANT DEUTSCHE BANK AG

98.     Defendant Deutsche Bank AG, a global investment bank, has a presence in more than 70 countries, with more than 2,700 branches worldwide.

99.     It is organized under the laws of, and headquartered in, Germany, and its principal office is in Frankfurt.

100.     Defendant operates a branch in New York State that is licensed, supervised, and regulated by the New York State Department of Financial Services (the "DFS"). Defendant also has a U.S. subsidiary, Deutsche Bank Trust Company Americas ("DBTCA"), which constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

101.     Defendants Deutsche Bank AG, Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), Credit Suisse, Commerzbank, and the HSBC Defendants are sometimes referred to herein collectively as "the Western Bank Defendants."

## V.     FACTUAL ALLEGATIONS

### A.     THE EURODOLLAR MARKET – IRAN'S MONEY LAUNDERING AND ILLICIT EXPORT NEXUS WITH DEFENDANT BANKS

102.     Iran needed access to the Eurodollar market in order to sustain the Islamic Revolutionary government that has ruled Iran since 1979.  The Government of Iran used the Eurodollar market for the following economic activities:

  a.     Investing petrodollar (in USD funds) revenue from Iran's oil and gas export sales;

  b.     Exporting the Iranian Islamic Revolution through acts of international terrorism; and

  c.     Illicitly acquiring U.S.-manufactured equipment, parts and technology to further its nuclear and conventional weapons programs.

103.     Iran did not have a legitimate need to access the Eurodollar market for the benefit of any Iranian civilian agency, operation or program; it could have operated with funds

denominated in any number of other Eurocurrencies (deciding, instead, to continually conduct its international trade primarily in Eurodollars).

104.    Specifically, Iran did in fact have access to viable alternative options both for foreign exchange and time deposits in Eurocurrencies (other than Eurodollars) to meet the needs of its civilian programs, including, but not limited to, its credit at the European Central Bank denominated in Euros, its credit at the International Monetary Fund ("IMF") denominated in Special Drawing Rights ("SDRs"), its credit at the Asian Clearing Union ("ACU") denominated in Asian Monetary Units ("AMUs"), or its domestic credit denominated in Iranian Rial.

105.    However, Iran would not have been able to move its funds undetected through the Eurodollar market without the covert operational and technical assistance it received from the Defendants.

106.    Likewise, Iran would not have been able to substantially fund Hezbollah and Shi'a militias in Iraq—and acquire U.S.-manufactured products (including dual-use technologies and export-controlled manufacturing equipment)—without access to USD funds through the Eurodollar market.

107.    In mid-2012, Iran's access to the Eurodollar market through the Defendant Banks was cut-off by SWIFT-Brussels.  Soon thereafter, Iran's domestic currency collapsed.

108.    The CBI was forced to intensify the use of its gold reserves in order to prop-up the Rial's value.

109.    Absent the Defendant Banks providing Iran and its proxies with decades of clandestine access to the Eurodollar market, Iran's foreign policy goal of furthering its Islamic Revolution through the financing of terrorism—including Iran's sponsorship of terrorist attacks

against Coalition Forces in Iraq between 2004 and 2011—would have been severely constrained.

110.    The global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

111.    According to the FRB-NY, the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

112.    Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar market were conducted electronically by telegraphic transfer ("TELEX").

113.    By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one *trillion* in USD funds.Nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

114.    The Clearing House Interbank Payment System ("CHIPS-NY") represents that it processes 95 percent of those Eurodollar funds transfers.

### B.    THE IRANIAN U-TURN EXEMPTION AND ITS REVOCATION

115.    Alongside its economic sanctions against Iran, the United States government designed an exception process to permit Iran's circumscribed access to U.S. dollars through a narrowly-tailored exemption to the Iranian Trade Regulations, known as the "U-

Turn exemption" (Section 560.516 of the Iranian Trade Regulations). At the same time, the U.S. government insisted that U.S. financial institutions operating in the Eurodollar market conduct careful monitoring of all Iranian transactions to both deter and detect the financing of sanctioned entities involved in, *inter alia*, Iran's terrorism and weapons proliferation activities.

116.    The purpose of the U-Turn exemption was to permit Iranian parties indirect access to USD funds, *provided* that these transactions were fully disclosed to U.S. correspondent banks; were strictly for Iran's legitimate agencies, operations and programs; and were not earmarked for terrorist, WMD proliferation or other proscribed purposes.
The U-Turn exemption was therefore conditioned on transparency to permit the careful monitoring of all Iranian transactions, both to deter and detect terror financing and weapons proliferation activities.

117.    Because so much of Iran's international trade has historically flowed through the United States for the clearing and settlement and because Iran's primary terrorist proxy, Hezbollah, operates in Lebanon (itself a dollarized economy and largely dependent on U.S. currency) maintaining transparency in the processing of Iranian USD transactions has been a vital part of the architecture of U.S. national security for decades and was reflected as such in the Iranian Trade Regulations.

118.    Iran's access through the U-Turn exemption was to be closely monitored filtering all U-Turn exemption transactions through sophisticated computer systems used by U.S. financial institutions to monitor and screen all USD-denominated wire transfers.
The Bank Defendants, however, knowingly and intentionally agreed to, and did, manipulate tens of thousands of payment order messages (SWIFT-NET MT 103 and MT 202) and the records of such transactions to defeat such monitoring and screening, and prevent transparency,

in order to provide USD funds to Iran for unlawful uses, which foreseeably included the support of Iranian terrorism and terrorist organizations.

119.   Without the agreement between the Defendants herein, and other foreign financial institutions, Iran could not have (a) transferred the overall volume of USD funds through the international financial system that it did; (b) surreptitiously transferred large amounts of these USD funds for the benefit of Hezbollah and the IRGC; and (c) exploited the Iranian U- Turn exemption to blind U.S. regulators and law enforcement to the degree, and for the duration, that it did.

## C.   DEFENDANTS USED LETTERS OF CREDIT TO EVADE DETECTION

120.   United States ITARs, ITRs, and EARs—and also various EU decisions and U.N. Security Council Resolutions—prohibited Iran from conducting both conventional weapons-trafficking  and WMD proliferation.

121.   To circumvent these prohibitions, Iran and its conspirators, including the Defendants herein, used Letters of Credit drawn on the CBI and other Iranian banks (and "stripped" the underlying payment orders), to clandestinely obtain and transport goods, technologies and weapons that were listed on the USML and/or CCL.

122.   Because the IRGC and Hezbollah needed to transport their terrorist operatives and weapons into Iraq, U.S. export-controlled item acquisitions financed by Letters of Credit were instrumental in facilitating the activities of these terrorist organizations, including, but  not limited to, helping Iran acquire component parts and technologies used to make the IEDs, EFPs, and Improvised Rocket-Assisted Munitions ("IRAMs") that were deployed by the Iraqi Special Groups against Coalition Forces.

## B.  DEFENDANT BANKS PARTICIPATION IN CONSPIRACY

123.    The HSBC Defendants, Deutsche Bank, Commerzbank, Standard Chartered Bank, Barclays, and Credit Suisse altered, falsified, or omitted information from payment order messages that they facilitated on behalf of Bank Saderat knowing, or deliberately indifferent to the fact, that Bank Saderat was engaged in money laundering on behalf of a State Sponsor of Terrorism, and after October 2007, that Bank Saderat was an SDGT that provided material support to Iran's terrorist activities, and, in the case of the HSBC Defendant, knew there was direct evidence of Bank Saderat "funding of Hezbollah."

124.    The HSBC Defendants, and Defendants Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank facilitated numerous payments totaling more than $60 million on behalf of IRISL knowing, or deliberately indifferent to the fact, that IRISL was designated a Specially Designated National ("SDN") by the United States for, as stated in the U.S. Treasury Department's September 10, 2008 press release announcing IRISL's designation, "facilitating shipments of military cargo destined for the (Iranian) Ministry of Defense and Armed Forces Logistics (MODAFL)," which could be used for terrorist attacks on Coalition Forces, including American nationals.

125.    Defendants Standard Chartered Bank, Credit Suisse, Bank Saderat Plc and Commerzbank all altered, falsified, or omitted information from payment messages (worth billions of U.S. dollars) that they facilitated on behalf of the National Iranian Oil Company, then an agent of the IRGC, knowing, or deliberately indifferent to the risk involved in rendering those payments without any transparency to U.S. regulators and law enforcement, and thereby directly providing the IRGC with access to billions of USD that it could move – undetected – through the global financial system.

126.    Defendant Standard Chartered Bank also knowingly and actively financed and facilitated illegal trade-finance transactions worth hundreds of millions of dollars on behalf of MODAFL, the IRGC and various instrumentalities of Iranian state- sponsored terror, including companies working directly for Hezbollah and the IRGC-Qods Force.

127.    Defendants HSBC Bank USA, N.A., Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank committed acts of international terrorism as defined in 18 U.S.C. § 2331(1) by supporting Iranian state-sponsored terror.

128.    Defendant HSBC Bank USA, N.A. is a U.S. person that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

129.    Deutsche Bank AG has a U.S. subsidiary, Deutsche Bank Trust Company Americas ("DBTCA"), which constitutes a "U.S. person" under the definitions set forth in 31 C.F.R. Part 560.314 of the Iranian Transactions Regulations (the "ITR") and 18 U.S.C. § 2332d(b)(2) of the Anti-Terrorism Act.

129.    Plaintiffs further allege that the U.S. branches of Defendants Barclays, Standard Chartered Bank, ABN Amro (RBS N.V.), and Commerzbank are U.S. persons that knowingly conducted financial transactions with Iran in the United States in violation of 18 U.S.C. § 2332d, and it was reasonably foreseeable that Iran would provide material support to acts of international terrorism that killed and injured American citizens in Iraq.

130.    Each of the Plaintiffs was injured as a result of an act of international terrorism for which Iran and its state-controlled organizations and terrorism proxies, including Hezbollah, were responsible.

## C.  PLAINTIFFS AND ATTACKS

### 1.   MAY 8, 2007 ATTACK – SALMAN PAK

**The Stephens Family**

131.     Blake Stephens was a citizen of the United States when he was killed in Iraq.

132.     On May 8, 2007, Blake Stephens, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

133.     Blake Stephens was killed in the attack.

134.     The weapon used to kill Blake Stephens was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

135.     Plaintiff Erin Dructor is a citizen of the United States and domiciled in the State of California. She is the widow of Blake Stephens.

136.     Plaintiff Kathleen Stephens is a citizen of the United States and domiciled in the State of California. She is the mother of Blake Stephens.

137.     Plaintiff Trent Stephens is a citizen of the United States and domiciled in the State of California. He is the father of Blake Stephens.

138.     Plaintiff Summer Stephens is a citizen of the United States and domiciled in the State of California. She is the sister of Blake Stephens.

139.     Plaintiff Rhett Stephens is a citizen of the United States and domiciled in the State of California. He is the brother of Blake Stephens.

140.     Plaintiff Brittani Hobson is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Blake Stephens.

141.     Plaintiff Derek Stephens is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Blake Stephens.

142.     Plaintiff Erin Dructor brings an action individually and on behalf of the Estate of Blake Stephens, as its legal representative.

143.     As a result of the attack, and the death of Blake Stephens, Plaintiffs, Erin Dructor, Kathleen Stephens, Trent Stephens, Summer Stephens, Rhett, Stephens, Brittani Hobson, and Derek Stephens have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband, son, and brother's society, companionship, comfort, advice and counsel.

**The Martinez Family**

144.     Plaintiff Saul Martinez is a citizen of the United States and domiciled in the State of Montana.

145.     On May 8, 2007, Plaintiff Saul Martinez, was serving in the U.S. military in Iraq.

146.     Plaintiff Saul Martinez was on patrol when an EFP struck his vehicle.

147.     The weapon used to injure Plaintiff Saul Martinez was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

148.     As a result of the attack, Plaintiff Saul Martinez lost both of his legs.

149.     As a result of the attack, and the injuries he suffered, Plaintiff Saul Martinez has experienced severe physical and mental anguish and extreme emotional pain and suffering.

150.     Plaintiff Sarah Martinez is a citizen of the United States and domiciled in the State of Montana. She is the wife of Saul Martinez.

151.     As a result of the attack, and the injuries suffered by Saul Martinez, Plaintiff Sarah Martinez has experienced severe mental anguish, and extreme emotional pain and suffering.

## 2.     JUNE 2, 2011 ATTACK-BAGHDAD

**The Rzepa Family**

152.     Plaintiff Jason Rzepa is a citizen of the United States and domiciled in the State of Montana.

153.     On June 2, 2011, Plaintiff Jason Rzepa, was serving in the U.S. military in Iraq.

154.     Plaintiff Jason Rzepa was gunner in a three (3) vehicle convoy when an EFP exploded near his vehicle.

155.     The weapon used to injure Plaintiff Jason Rzepa was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

156.     As a result of the attack, Plaintiff Jason Rzepa lost both of his legs.

157.     As a result of the attack, and the injuries he suffered, Plaintiff Jason Rzepa has experienced severe physical and mental anguish and extreme emotional pain and suffering.

158.     Plaintiff Cassandra Rzepa is a citizen of the United States and domiciled in the State of Idaha. She is the ex-wife of Jason Rzepa.

159.     Plaintiff C.R., a minor represented by his legal guardian Cassandra Rzepa, is a citizen of the United States and domiciled in the State of Idaho. He is the son of Jason Rzepa.

160.     Plaintiff K.R., a minor represented by his legal guardian Adrian Davis, is a citizen of the United States and domiciled in the State of Idaho.  He is the son of Jason Rzepa.

161.     Plaintiff Ann Rzepa is a citizen of the United States and domiciled in the State of Idaho. She is the mother of Jason Rzepa.

162.     Plaintiff David Shaidell is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Jason Rzepa.

163.     As a result of the attack, and the injuries suffered by Jason Rzepa, Plaintiff Jason Rzepa, Cassandra Rzepa, C.R., a minor, A.R., a minor, Ann Rzepz, and David Shaidell have experienced severe mental anguish and extreme emotional pain and suffering.

### 3.     APRIL 12, 2006 ATTACK-MISIAB

**The Calderon Family**

164.      Roland Calderon was a citizen of the United States when he was killed in Iraq.

165.      On April 12, 2006, Roland Calderon, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

166.      Roland Calderon was killed in the attack.

167.      The weapon used to kill Blake Stephens was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

168.      Plaintiff Mirtha Ponce is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Roland Calderon.

169.      Plaintiff A.L.C., a minor, represented by his legal guardian Mirtha Pounce, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Roland Calderon.

170.      Plaintiff, A.D.C, a minor, represented by her legal guardian Mirtha Pounce, is a citizen of the United States and domiciled in the State of Georgia. She is the daughter of Roland Calderon.

171.      Plaintiff Rosa Milagros is a citizen of the United States and domiciled in the State of Florida. She is the mother of Roland Calderon.

172.      Plaintiff Yeny Rauda is a citizen of the United States and domiciled in the State of Florida. She is the sister of Roland Calderon.

173.      Plaintiff Jasmyn Rauda is a citizen of the United States and domiciled in the State of Florida. She is the sister of Roland Calderon.

174.      Plaintiff Evelyn Rauda is a citizen of the United States and domiciled in the State of Florida. She is the sister of Roland Calderon.

175.     Plaintiff Mirtha Ponce brings an action individually and on behalf of the Estate of Roland Calderon, as its legal representative.

176.     As a result of the attack, and the death of Roland Calderon, Plaintiffs Mirtha Ponce, A.L.C., a minor, A.D.C., a minor, Rosa Milagros, Yeny Rauda, Jasmyn Rauda, and Evelyn Rauda have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father, son and brother's society, companionship, comfort, advice and counsel.

## 4.     SEPTEMBER 22, 2007 ATTACK-BAGHDAD

**The Reeves Family**

134.     Joshua Reeves was a citizen of the United States when he was killed in Iraq.

135.     On September 22, 2007, Joshua Reeves, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

136.     Joshua Reeves was killed in the attack.

137.     The weapon used to kill Joshua Reeves was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

138.     Plaintiff Leslie Hardcastle is a citizen of the United States and domiciled in the State of Georgia. She is the widow of Joshua Reeves.

139.     Plaintiff J.R., a minor represented by his legal guardian, Leslie Hardcastle, is a citizen of the United States and domiciled in the State of Georgia. He is the son of Joshua Reeves.

140.     Plaintiff Jean Reeves is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Joshua Reeves.

141.     Plaintiff James Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the father of Joshua Reeves.

142.     Plaintiff Michael Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Joshua Reeves.

143.     Plaintiff Jared Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Joshua Reeves.

144.     Plaintiff Leslie Hardcastle brings an action individually and on behalf of the Estate of Joshua Reeves, as its legal representative.

145.     As a result of the attack, and the death of Joshua Reeves, Plaintiffs Leslie Hardcastle, J.R., a minor, Jean Reeves, James Reeves, Michael Reeves, and Jared Reeves have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father, son and brother's society, companionship, comfort, advice and counsel.

## 5.     JULY 5, 2007 ATTACK-BAGHDAD

### The Ahearn Family

146.     James Ahearn was a citizen of the United States when he was killed in Iraq.

147.     On July 5, 2007, James Ahearn, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

148.     James Ahearn was killed in the attack.

149.     The weapon used to kill James Ahearn was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

150.     Plaintiff Constance Ahearn is a citizen of the United States and domiciled in the State of California. She is the mother of Joshua Reeves.

151.     Plaintiff James Ahearn Sr. is a citizen of the United States and domiciled in the State of Arizona. He is the father of Joshua Reeves.

152.     Plaintiff Kevin Ahearn is a citizen of the United States and domiciled in the State

of Arizona. He is the brother of Joshua Reeves.

153.    Plaintiff Constance Ahearn brings an action individually and on behalf of the

Estate of Joshua Reeves, as its legal representative.

154.    As a result of the attack, and death of James Ahearn, Plaintiffs Constance Ahearn,

James Ahearn Sr. and Kevin Ahearn have experienced severe mental anguish, extreme emotional

pain and suffering, and the loss of their husband, father, son and brother's society, companionship,

comfort, advice and counsel.

## 6.    AUGUST 6, 2007 ATTACK-BAGHDAD

**The Neiberger Family**

155.    Christopher Neiberger was a citizen of the United States when he was killed in

Iraq.

156.    On August 6, 2007, Christopher Neiberger, was serving in the U.S. military in Iraq

when an EFP detonated near his vehicle.

157.    Christopher Neiberger was killed in the attack.

158.    The weapon used to kill Christopher Neiberger was an Iranian-manufactured EFP

provided to Iranian-funded and -trained terror operatives in Iraq.

159.    Plaintiff Mary Neiberger is a citizen of the United States and domiciled in the State

of Florida. She is the mother of Christopher Neiberger.

160.    Plaintiff Richard Neiberger is a citizen of the United States and domiciled in the

State of Florida. He is the father of Christopher Neiberger.

161.    Plaintiff Ami Neiberger is a citizen of the United States and domiciled in the State

of Virginia. She is the sister of Christopher Neiberger.

162.    Plaintiff Robert Neiberger is a citizen of the United States and domiciled in the

State of Maryland. He is the brother of Christopher Neiberger.

163.     Plaintiff Eric Neiberger is a citizen of the United States and domiciled in the State of Florida. He is the brother of Christopher Neiberger.

164.     Plaintiff Mary Neiberger brings an action individually and on behalf of the Estate of Christopher Neiberger, as its legal representative.

165.     As a result of the attack, and the death of Christopher Neiberger, Plaintiffs Mary Neiberger, Richard Neiberger, Ami Neiberger, Robert Neiberger, Eric Neiberger have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## 7.     NOVEMBER 2, 2006 ATTACK-BAGHDAD

### The Gage Family

166.     Joseph Gage was a citizen of the United States when he was killed in Iraq.

167.     On November 2, 2006, Joseph Gage, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

168.     Joseph Gage was killed in the attack.

169.     The weapon used to kill Joseph Gage was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

170.     Plaintiff Samantha Gage is a citizen of the United States and domiciled in the State of Michigan. She is the widow of Joseph Gage.

171.     Plaintiff, M.G, a minor represented by his legal guardian, Samantha Gage, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Samantha Gage.

172.     Plaintiff Randy Gage is a citizen of the United States and domiciled in the State of

California. He is the father of Joseph Gage.

173.     Plaintiff Tamara Gage is a citizen of the United States and domiciled in the State of California. She is the step-mother of Joseph Gage.

174.     Plaintiff Julia Rosa is a citizen of the United States and domiciled in the State of California. She is the sister of Joseph Gage.

175.     As a result of the attack, and the death of Joseph Gage, Plaintiffs Samantha Gage, M.G., a minor, Randy Gage, Tamara Gage, and Julia Rosa have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father, son and brother's society, companionship, comfort, advice and counsel.

## 8.     MAY 5, 2006 ATTACK-BAGHDAD

## The Torres Family

176.     Teodoro Torres was a citizen of the United States when he was killed in Iraq.

177.     On May 5, 2006, Teodoro Torres, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

178.     Teodoro Torres was killed in the attack.

179.     The weapon used to kill Teodoro Torres was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

180.     Plaintiff Yarissa Torres is a citizen of the United States and domiciled in the State of New York. She is the widow of Teodoro Torres.

181.     Plaintiff Yarissa Torres brings an action individually and on behalf of the Estate of Teodoro Torres, as its legal representative.

182.     As a result of the attack, and the death of Teodoro Torres, Plaintiff Yarissa Torres has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her

husband's society, companionship, comfort, advice and counsel.

## 9.    JULY 16, 2009 ATTACK-BASRA

## The Wilcox Family

183.    Carlos Wilcox was a citizen of the United States when he was killed in Iraq.

184.    On July 16, 2009, Carlos Wilcox, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

185.    Carlos Wilcox was killed in the attack.

186.    The weapon used to kill Carlos Wilcox was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

187.    Plaintiff Charlene Wilcox is a citizen of the United States and domiciled in the State of Minnesota. She is the mother of Carlos Wilcox.

188.    Plaintiff Bianca Wilcox is a citizen of the United States and domiciled in the State of Minnesota. She is the mother of Carlos Wilcox.

189.    Plaintiff Ona Wilcox is a citizen of the United States and domiciled in the State of Minnesota. She is the sister of Carlos Wilcox.

190.    Plaintiff Charles Wilcox III is a citizen of the United States and domiciled in the State of Minnesota. He is the brother of Carlos Wilcox.

191.    Plaintiff Charlene Wilcox brings an action individually and on behalf of the Estate of Carlos Wilcox, as its legal representative.

192.    As a result of the attack, and the death of Carlos Wilcox, Plaintiffs Charlene Wilcox, Bianca Wilcox, Ona Wilcox, and Charles Wilcox III have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society,

companionship, comfort, advice and counsel.

## 10.     APRIL 12, 2009 ATTACK-BAYLA

**The Anaya Family**

193.    Michael Anaya was a citizen of the United States when he was killed in Iraq.

194.    On April 12, 2009, Michael Anaya, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

195.    Michael Anaya was killed in the attack.

196.    The weapon used to kill Michael Anaya was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

197.    Plaintiff Cheryl Anaya is a citizen of the United States and domiciled in the State of Florida. She is the mother of Michael Anaya.

198.    Plaintiff Trista Moffett is a citizen of the United States and domiciled in the State of Florida. She is the sister of Michael Anaya.

199.    Plaintiff Carmelo Anaya Jr. is a citizen of the United States and domiciled in the State of Florida. He is the brother of Michael Anaya.

200.    Plaintiff Cheryl Anaya brings an action individually and on behalf of the Estate of Michael Anaya, as its legal representative.

201.    As a result of the attack, and the death of Michael Anaya, Plaintiffs Cheryl Anaya, Trista Moffett, and Carmelo Anaya Jr. have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## 11.     JUNE 29, 2007 ATTACK-BAGHDAD

## The Adair Family

202.     James Adair was a citizen of the United States when he was killed in Iraq.

203.     On June 29, 2007, James Adair, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

204.     James Adair was killed in the attack.

205.     The weapon used to kill James Adair was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

206.     Plaintiff Chelsea Adair is a citizen of the United States and domiciled in the State of Texas. She is the widow of James Adair.

207.     Plaintiff, A.A., a minor represented by her legal guardian, James Adair, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of James Adair.

208.     Plaintiff Chelsea Adair brings an action individually and on behalf of the Estate of James Adair, as its legal representative.

209.     As a result of the attack, and the death of James Adair, Plaintiffs Chelsea Adair and A.A, a minor, have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband and father's society, companionship, comfort, advice and counsel.

## The Takai Family

210.     Plaintiff John Takai is a citizen of the United States and domiciled in the State of Texas.

211.     On June 29, 2007, Plaintiff John Takai, was serving in the U.S. military in Iraq.

212.     Plaintiff John Takai was injured when an EFP exploded near his vehicle.

213.     The weapon used to injure Plaintiff John Takai was an Iranian-manufactured EFP

provided to Iranian-funded and -trained terror operatives in Iraq

214.    As a result of the attack, Plaintiff John Takai has a traumatic brain injury, PTSD, and a lower left salvaged arm.

215.    As a result of the attack, and the injuries he suffered, Plaintiff John Takai has experienced severe physical and mental anguish and extreme emotional pain and suffering.

216.    Plaintiff Mae Takai is a citizen of the United States and domiciled in the State of Texas . She is the wife of John Takai.

217.    Plaintiff J.T., a minor represented by her legal guardian John Takai, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of John Takai.

218.    Plaintiff N.T., a minor represented by her legal guardian John Takai, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of John Takai.

219.    Plaintiff K.T., a minor represented by her legal guardian John Takai, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of John Takai.

220.    Plaintiff I.T., a minor represented by her legal guardian John Takai, is a citizen of the United States and domiciled in the State of Texas. She is the daughter of John Takai.

221.    Plaintiff Patricia Cruze is a citizen of the United States and domiciled in the Territory of Guam. She is the mother of John Takai.

222.    Plaintiff Juan Takai is a citizen of the United States and domiciled in the State of Texas. He is the father of John Takai.

223.    Plaintiff Jolean Takai is a citizen of the United States and domiciled in the Territory of Guam . She is the sister of John Takai.

224.    Plaintiff Jermaine Takai is a citizen of the United States and domiciled in the State of Texas. He is the brother of John Takai.

225.     As a result of the attack, and the injuries suffered by John Takai, Plaintiff John Takai, Mae Takai, J.T., a minor, N.T., a minor, K.T., a minor, I.T., a minor, Patricia Cruze, Juan Takai, Jolean Takai, and Jermaine Takai  have experienced severe mental anguish and extreme emotional pain and suffering.

## 12.     JULY 7, 2007 ATTACK-BAGHDAD

**The Kline Family**

226.     Keith Kline was a citizen of the United States when he was killed in Iraq.

227.     On July 7, 2007, Keith Kline, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

228.     Keith Kline was killed in the attack.

229.     The weapon used to kill Keith Kline was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

230.     Plaintiff Betty Jean Kline is a citizen of the United States and domiciled in the State of Ohio. She is the mother of Keith Kline.

231.     Plaintiff John Kline is a citizen of the United States and domiciled in the State of Ohio. He is the brother of Keith Kline.

232.     Plaintiff Betty Jean Kline brings an action individually and on behalf of the Estate of Keith Kline, as its legal representative.

233.     As a result of the attack, and the death of Keith Kline, Plaintiffs Betty Jean Kline and John Kline, have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## 13.     MAY 19, 2007 ATTACK-AL DIWANIYA

**The Dahlman Family**

45

234.     Plaintiff Louis Dahlman is a citizen of the United States and domiciled in the State of Texas.

235.     On May 19, 2007, Plaintiff Louis Dahlman, was serving in the U.S. military in Iraq.

236.     Plaintiff Louis Dahlman was injured when an EFP exploded near his vehicle.

237.     The weapon used to injure Plaintiff Louis Dahlman was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

238.     As a result of the attack, Plaintiff Louis Dahlman has traumatic brain injury, PTSD, and a prosthetic jaw.

239.     As a result of the attack, and the injuries he suffered, Plaintiff Louis Dahlman has experienced severe physical and mental anguish and extreme emotional pain and suffering.

240.     Plaintiff Kay Stockdale is a citizen of the United States and domiciled in the State of Iowa . She is the mother of Louis Dahlman.

241.     As a result of the attack, and the injuries suffered by Louis Dahlman, Plaintiff Louis Dahlman and Kay Stockdale have experienced severe mental anguish and extreme emotional pain and suffering.

## 14.     JUNE 1, 2008 ATTACK-BAGHDAD

**The Mixon Family**

Justin Mixon was a citizen of the United States when he was killed in Iraq.

243.     On June 1, 2008, Justin Mixon, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

244.     Justin Mixon was killed in the attack.

245.    The weapon used to kill Justin Mixon was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

246.    Plaintiff Melinda Mixon is a citizen of the United States and domiciled in the State of Texas. She is the widow of Justin Mixon/

247.    Plaintiff T.R.M.., a minor represented by his legal guardian Tia Mixon, is a citizen of the United States and domiciled in the State of Texas. He is the son of Justin Mixon.

248.    Plaintiff Melinda Mixon is a citizen of the United States and domiciled in the State of Mississippi. She is the mother of Justin Mixon.

249.    Plaintiff Walter Mixon is a citizen of the United States and domiciled in the State of Mississippi. He is the father of Justin Mixon.

250.    Plaintiff Kenneth Mixon is a citizen of the United States and domiciled in the State of Mississippi. He is the brother of Justin Mixon.

251.    Plaintiff Kimberly Spillyards is a citizen of the United States and domiciled in the State of Mississippi. She is the sister of Justin Mixon.

252.    Plaintiff Tia Mixon brings an action individually and on behalf of the Estate of Justin Mixon, as its legal representative.

253.    As a result of the attack, and the death of Justin Mixon, Plaintiffs Tia Mixon, T.R.M., a minor, Melinda Mixon, Walter Mixon, Kenneth Mixon, and Kimberly Spillyards have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father, son and brother's society, companionship, comfort, advice and counsel.  **15.**

## DECEMBER 6, 2006 ATTACK-HAWIJAH

### The Huffman Family

252.    Jason Huffman was a citizen of the United States when he was killed in Iraq.

253.    On December 6, 2006, Jason Huffman, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

254.    Jason Huffman was killed in the attack.

255.    The weapon used to kill Jason Huffman was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

256.    Plaintiff Karen Huffman is a citizen of the United States and domiciled in the State of Colorado. She is the mother of Jason Huffman.

257.    Plaintiff Gary Huffman is a citizen of the United States and domiciled in the State of Colorado. He is the father of Jason Huffman.

258.    Plaintiff Karen Huffman brings an action individually and on behalf of the Estate of Jason Huffman, as its legal representative.

259.    As a result of the attack, and the death of Jason Huffman, Plaintiffs Karen Huffman and Gary Huffman have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son's society, companionship, comfort, advice and counsel.

## 15.    APRIL 22, 2011 ATTACK-NUMANIYAH

**The Vazquez Family**

260.    Omar Vazquez was a citizen of the United States when he was killed in Iraq.

261.    On April 22 2011, Omar Vazquez, was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

262.    Omar Vazquez was killed in the attack.

263.    The weapon used to kill Omar Vazquez was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

264.    Plaintiff Maria Vazquez is a citizen of the United States and domiciled in the State

of New Jersey. She is the mother of Omar Vazquez.

265.    Plaintiff Maria Vazquez brings an action individually and on behalf of the Estate of Omar Vazquez, as its legal representative.

266.    As a result of the attack, and the death of Omar Vazquez, Plaintiff Maria Vazquez has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of her son's society, companionship, comfort, advice and counsel.

## 16.    MARCH 29, 2008 ATTACK-BAGHDAD

### The Bennett Family

267.    Durrell Bennett was a citizen of the United States when he was killed in Iraq.

268.    On March 29, 2008, Durrell Bennett was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

269.    Durrell Bennett was killed in the attack.

270.    The weapon used to kill Durrell Bennett was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

271.    Plaintiff Doris Bennett is a citizen of the United States and domiciled in the State of Washington. She is the mother of Durrell Bennett.

272.    Plaintiff Dempsey Bennett is a citizen of the United States and domiciled in the State of Washington. He is the father of Durrell Bennett.

273.    Plaintiff Darnell Bennett is a citizen of the United States and domiciled in the State of Washington. He is the brother of Durrell Bennett.

272.    Plaintiff Doris Bennett brings an action individually and on behalf of the Estate of Durrell Bennett, as its legal representative.

273.    As a result of the attack, and the death of Durrell Bennett, Plaintiffs Doris Bennett,

Dempsey Bennett and Durrell Bennett have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## 17.   APRIL 18, 2006 ATTACK-BALAD

**The Weikel Family**

274.    Ian Weikel was a citizen of the United States when he was killed in Iraq.

275.    On April 18, 2006, Ian Weikel was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

276.    Ian Weikel was killed in the attack.

277.    The weapon used to kill Ian Weikel was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

278.    Plaintiff Wendy Green is a citizen of the United States and domiciled in the State of Minnesota. She is the widow of Ian Weikel.

279.    Plaintiff J.W., a minor represented by his legal guardian Wendy Green, is a citizen of the United States and domiciled in the State of Minnesota. He is the son of Ian Weikel.

280.    Plaintiff Chad Weikel is a citizen of the United States and domiciled in the State of Colorado. He is the brother of Ian Weikel.

281.    Plaintiff Wendy Green brings an action individually and on behalf of the Estate of Ian Weikel, as its legal representative.

282.    As a result of the attack, and the death of Ian Weikel, Plaintiffs Wendy Green, J.W., a minor and Chad Weikel have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father and brother's society, companionship, comfort, advice and counsel.

## 18.   JULY 14, 2007 ATTACK-BAGHDAD

**The Kube Family**

283.     Christopher Kube was a citizen of the United States when he was killed in Iraq.

284.     On July 14, 2007, Christopher Kube was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

285.     Christopher Kube was killed in the attack.

286.     The weapon used to kill Christopher Kube was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

287.     Plaintiff Debbie Otte is a citizen of the United States and domiciled in the State of Michigan. She is the mother of Christopher Kube.

288.     Plaintiff David Kube is a citizen of the United States and domiciled in the State of Michigan. He is the father of David Kube.

289.     Plaintiff Jonathan Kube is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Christopher Kube.

290.     Plaintiff Jessica Kube is a citizen of the United States and domiciled in the State of Michigan.  She is the sister of Christopher Kube.

291.     Plaintiff Jason Kube is a citizen of the United States and domiciled in the State of Michigan. He is the brother of Christopher Kube.

292.     Jennifer Kube is a citizen of the United States and domiciled in the State of Michigan.  She is the sister of Christopher Kube.

293.     Plaintiff David Kube brings an action individually and on behalf of the Estate of Christopher Kube, as its legal representative.

294.     As a result of the attack, and the death of Christopher Kube, Plaintiffs Debbie Otte,

David Kube, Jonathan Kube, Jessica Kube, Jason Kube, and Jennifer Kube has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their son and brother's society, companionship, comfort, advice and counsel.

## 19.    AUGUST 4, 2008 ATTACK-BAGHDAD

**The Henry Family**

295.    Gary Henry was a citizen of the United States when he was killed in Iraq.

296.    On August 4, 2008, Gary Henry was serving in the U.S. military in Iraq when an EFP detonated near his vehicle.

297.    Gary Henry was killed in the attack.

298.    The weapon used to kill Gary Henry was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

299.    Plaintiff Gary L. Henry is a citizen of the United States and domiciled in the State of Indiana. He is the father of Gary Henry.

300.    Plaintiff Gary L. Henry brings an action individually and on behalf of the Estate of Gary Henry, as its legal representative.

301.    As a result of the attack, and the death of Gary Henry, Plaintiff Gary L. Henry has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of son's society, companionship, comfort, advice and counsel.

## 20.    JULY 6, 2007 ATTACK-BAGHDAD

**The Lill Family**

302.    Eric Lill was a citizen of the United States when he was killed in Iraq.

303.    On July 6, 2007, Eric Lill was serving in the U.S. military in Iraq when an EFP

detonated near his vehicle.

304.    Eric Lill was killed in the attack.

305.    The weapon used to kill Eric Lill was an Iranian-manufactured EFP provided to Iranian-funded and -trained terror operatives in Iraq.

306.    Plaintiff Skye Otero is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Eric Lill.

307.    Plaintiff C.L., a minor represented by his legal guardian Skye Otero, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Eric Lill.

308.    Plaintiff M.L., a minor represented by his legal guardian Skye Otero, is a citizen of the United States and domiciled in the State of Tennessee. She is the daughter of Eric Lill.

309.    Plaintiff Anthony Lill is a citizen of the United States and domiciled in the State of Tennessee. He is the father of Eric Lill.

310.    Plaintiff Charmaine Lill is a citizen of the United States and domiciled in the State of Tennessee. She is the mother of Eric Lill.

311.    Plaintiff Anthony Lill  brings an action individually and on behalf of the Estate of Gary Henry, as its legal representative.

312.    As a result of the attack, and the death of Eric Lill, Plaintiff  Skye Otero, C.L., a minor, M.L., a minor, Anthony Lill and Charmaine Lill has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of their husband, father and son's society, companionship, comfort, advice and counsel.

## F.    DEFERRED PROSECUTION AGREEMENTS AND CONSENT ORDER

### 1.    Barclays Bank PLC

xx.    On August 16, 2010, Barclays Bank PLC agreed to plead to a criminal

information and signed a deferred prosecution agreement in which it agreed to forfeit $298 million to the United States and to the New York County District Attorney's Office in connection with violations of the International Emergency Economic Powers Act (IEEPA) and the Trading with the Enemy Act (TWEA).

xx.     According to court documents, from as early as the mid-1990s until September 2006, Barclays knowingly and willfully moved or permitted to be moved hundreds of millions of dollars through the U.S. financial system on behalf of banks from Cuba, Iran, Libya, Sudan and Burma, and persons listed as parties or jurisdictions sanctioned by OFAC in violation of U.S. economic sanctions. Barclays followed instructions, principally from banks in Cuba, Iran, Libya, Sudan and Burma, not to mention their names in U.S. dollar payment messages sent to Barclays' branch in New York and to other financial institutions located in the United States. Barclays routed U.S. dollar payments through an internal Barclays account to hide the payments' connection to OFAC-sanctioned entities and amended and reformatted the U.S dollar payment messages to remove information identifying the sanctioned entities. Barclays also deliberately used a less transparent method of payment messages, known as cover payments, as another way of hiding the sanctioned entities identifying information.

xx.     A high-ranking Department of Justice official stated at the release of the guilty plea and DPA that "Banks like Barclays will not be permitted to disregard sanctions put in place by the U.S. government. . . . Not just once, but numerous times over more than a decade. Barclays stripped vital information out of payment messages that would have alerted U.S. financial institutions about the true origins of the funds. This serious conduct has now resulted in a serious

sanction – forfeiture of $298 million, a public admission of its illegal acts, and the implementation of stringent compliance measures."

xx.    The DPA further described the history of the Iran Sanctions in which there were Executive Orders which prohibited virtually all trade and investment activities between the United States and Iran, including trade-related transactions with Iran by U.S. persons, including financing, facilitating, or guaranteeing such transactions, and described how Barclays violated these restrictions.   DPA, p. 5.

　　　　　2.    HSBC –USA DPA

xx.    On December 11, 2012, HSBC Holdings plc (HSBC Group) and HSBC Bank USA N.A. (HSBC Bank USA) (together, HSBC Group), a federally chartered banking corporation headquartered in McLean, Va. agreed to forfeit $1.256 billion and enter into a deferred prosecution agreement with the U.S. Justice Department for HSBC's violations of the Bank Secrecy Act (BSA), the International Emergency Economic Powers Act (IEEPA) and the Trading with the Enemy Act (TWEA).  According to court documents, HSBC Bank USA violated the BSA by failing to maintain an effective anti-money laundering program and to conduct appropriate due diligence on its foreign correspondent account holders.  The HSBC Group violated IEEPA and TWEA by illegally conducting transactions on behalf of customers in Cuba, Iran, Libya, Sudan and Burma – all countries that were subject to sanctions enforced by the Office of Foreign Assets Control (OFAC) at the time of the transactions.

xx.    According to the Criminal Information to which HSBC Group pleaded as part of this DPA, from the mid-1990s through September 2006, HSBC Group allowed approximately $660 million in OFAC-prohibited transactions to be processed through U.S.

financial institutions, including HSBC Bank USA.  HSBC Group followed instructions from sanctioned entities such as Iran, Cuba, Sudan, Libya and Burma, to omit their names from U.S. dollar payment messages sent to HSBC Bank USA and other financial institutions located in the United States.  The bank also removed information identifying the countries from U.S. dollar payment messages; deliberately used less-transparent payment messages, known as cover payments; and worked with at least one sanctioned entity to format payment messages, which prevented the bank's filters from blocking prohibited payments.

xx.     An FBI director stated at the press release of the DPA that "Today HSBC is being held accountable for illegal transactions made through the U.S. financial system on behalf of entities subject to U.S. economic sanctions."

3.     Deutsche Bank AG New York Branch Consent Order

xx.     On November 4, 2015, the State of New York announced the entering into of a consent order with Deutsche Bank, in which the Bank agreed to pay $258 million and install an independent monitor for New York Banking Law violations in connection with transactions on behalf of countries and entities subject to U.S. sanctions, including Iran, Libya, Syria, Burma, and Sudan.

xx.     The Consent Order provides that from at least 1999 through 2006, Deutsche Bank used non-transparent methods and practices to conduct more than 27,200 U.S. dollar clearing transactions valued at over $10.86 billion on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities subject to U.S. economic sanctions, including

entities on the Specially Designated Nationals ("SDN") List of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

xx.    From at least year 1999, Bank employees recognized that U.S. sanctions rules, which applied at that time or over the course of subsequent years to Iranian, Syrian, Libyan, Burmese, or Sudanese customers, or to customers who were listed on OFAC's SDN list, would pose problems for U.S. dollar payments sent to or cleared through the U.S., including clearing done through Deutsche Bank New York.   Payments involving sanctioned entities were subject to additional scrutiny and might be delayed, rejected, or frozen in the United States.  In order to facilitate what it saw as "lucrative" U.S. dollar business for sanctioned customers, Bank employees developed and employed several processes to handle dollar payments in non-transparent ways that circumvented the controls designed to detect potentially-problematic payments.

xx.    One method was wire stripping, or alteration of the information included on the payment message.  Bank staff in overseas offices handling Message Type 103 serial payment messages, or MT103s, removed information indicating a connection to a sanctioned entity before the payment was passed along to the correspondent bank in the U.S.   With any potentially-problematic information removed (or, as was done in some cases, replaced with innocuous information, such as showing the bank itself as the originator), the payment message did not raise red flags in any filtering systems or trigger any additional scrutiny or blocking that otherwise would have occurred if the true details were included.

xx.    A second method was the use of non-transparent cover payments.  The cover payment method involved splitting an incoming MT103 message into two message streams:  an MT103, which included all details, sent directly to the beneficiary's bank, and a second message,

an MT202, which did not include details about the underlying parties to the transaction, sent to Deutsche Bank New York or another correspondent clearing bank in the U.S.  In this way, no details that would have suggested a sanctions connection and triggered additional delay, blocking, or freezing of the transactions were included in the payment message sent to the U.S. bank.

xx.     Bank employees recognized that these handling processes were necessary in order to evade the sanctions-related protections and controls of Deutsche Bank New York and other correspondents.  The Consent Order, p. 6, specifically describes that sanctioned customers were told to not mention the Bank's name in MT 103 payments, specifically stating "PLS DON'T MENTION THE NAME OF BANK SADERAT IRAN OR IRAN IN USA," or "THE NAME BANK MELLI OR MAKAZI SHOULD NOT BE MENTIONED . . . IMPORTANT, NO IRANIAN NAMES TO BE MENTIONED WHEN MAKING PAYMENT TO NEW YORK." Consent Order, p. 6-7.

4.     <u>Standard Chartered Bank Consent Order</u>

xx.     On August 6, 2012, Standard Chartered Bank entered into a Consent Order with the State of New York to resolve claims resulting from its removal or omission of Iranian information from financial transactions.   The Consent Order states that from at least January 2001 through 2007, SCB provided U.S. dollar clearing services to Iranian state and privately owned banks, corporations, and individuals.   In processing transactions on behalf of its Iranian customers, SCB removed or omitted Iranian information from U.S. dollar wire payment messages through a practice known internally at SCB as "repair," which was designed to help SCB compete for Iranian business and to avoid potential processing delays.

xx.    The removal or omission of Iranian information, by the use of cover payments or by "repair," occurred with respect to approximately 59,000 transactions totaling approximately $250 billion. This prevented New York State regulators from performing complete safety and soundness examinations, and from identifying suspicious patterns of activity, which could, among other things, allow regulators to assist law enforcement authorities.

5.    <u>Commererz Bank AG Deferred Prosecution Agreements and Consent Order</u>

xx.    On March 11, 2015, Commerzbank AG, reached a multi-agency criminal and civil resolution of allegations that Commerzbank engaged in a practice of remitting "non-transparent" cross-border payments involving sanctioned clients through its New York branch and Bank Secrecy Act/anti-money laundering compliance failures.   Commerzbank entered into deferred prosecution agreements ("DPAs") with the U.S. Department of Justice and the Manhattan District Attorney's Office in which Commerzbank admitted to criminal violations of the International Emergency Economic Powers Act, the Bank Secrecy Act and recordkeeping provisions of the New York State Penal Law, and agreed to pay $1.45 billion in civil and criminal penalties to the agencies, undertake significant remedial measures, engage an independent compliance monitor and terminate or take other disciplinary action with respect to individuals deemed accountable for the misconduct.

xx.    The factual allegations to the DPA state that starting in or around January 2002 and ending in or around December 2008, Commerz Bank violated U.S. and New York State laws by assisting clients—such as Iranian companies—in evading U.S. sanctions. Specifically, Commerz sent payments involving sanctioned entities **or** entities affiliated with sanctioned countries through the U.S. financial system.   Commerz knowingly and willfully concealed from U.S. financial institutions and regulators the sanctioned entities' connection to these transactions and

intentionally falsified the business records of these institutions. Consequently, U.S. financial institutions processed transactions that otherwise should have been rejected, blocked, **or** stopped for investigation.

xx.   Commerz's criminal conduct included, among other things, (i) sending payments from Frankfurt on behalf of sanctioned clients without reference to the payments' origin; (ii) eliminating payment data that would have revealed the involvement of sanctioned entities; (iii) directing an <u>Iranian</u> client to transfer payments in the name of its subsidiary companies to mask the Iranian client's involvement; (iv) issuing checks to an Iranian client that showed only the Iranian bank's account number and not its name; and (v) using alternative payment methods to mask the involvement of sanctioned entities.

xx.      Similar to the other Banks above, CommerzBank manipulated the SWIFT system. Commerz typically executed and processed international USD payments on behalf of clients in one of two ways. The first method, known as a "serial payment," was to send a single message, commonly an MT-103, to each financial institution in the transmission chain, identifying the originator and beneficiary of the USD payment. The second method, known as a "cover payment," involved breaking a payment message into two parts and sending two SWIFT messages in connection with a single payment. In the cover payment method, one message—typically an MT 103—identifying both the originating customer and beneficiary of the payment was sent directly from the customer's bank (i.e., Foreign Bank A ) to the ultimate beneficiary's bank (i.e., Foreign Bank B) while a second message—typically an MT 202—identifying only the bank originating the cover payment (but not the customer or the beneficiary) accompanied the funds as they transferred through the United States. During the relevant time period, cover payment messages did not require the sending bank to identify the party originating a commercial payment or its

ultimate beneficiary, whereas serial payment messages did. As a result, where the cover payment method was employed, the U.S.-based bank did not receive information needed to stop transactions involving sanctioned entities.

4. By providing these banking services to clients that themselves were subject to U.S. sanctions or clients that were doing business with sanctioned entities, Commerz: (i) prevented detection by U.S. regulatory and law enforcement authorities of financial transactions that violated U.S. sanctions; (ii) prevented U.S. financial institutions from filing required sanctions-related reports with the U.S. government; (iii) caused false information and entries to be recorded in the business records of U.S. financial institutions located in New York, New York; and (iv) caused U.S. financial institutions not to make records that they otherwise would have been required by U.S. law to make.

6.      Royal Bank of Scotland Consent Order with Federal and State Authorities

xx.      On December 11, 2013, the Royal Bank of Scotland (now known as ABN Amro) entered into agreements with the State of New York Department of Financial Services, the Treasury Department's OFAC, and the Federal Reserve to pay $100 million in fines settle civil investigations into accusations that some of its former employees helped conceal transactions involving customers from Iran, Sudan and other nations subject to international sanctions for about a decade.

xx.   The Agreements provide that bank regulators in New York contend the former R.B.S. employees used a variety of techniques to conceal about 3,500 transactions involving the transfer of $523 million through New York banks.   Similar to the Agreements with the other Bank

Defendants, former employees of the RBS helped customers and companies with ties to countries under sanctions strip out identifying data from payment messages. New York bank regulators found that some within RBS operated from written instructions "containing a step-by-step guide" on how to keep United States dollar payments from being detected.

       7.    <u>Credit Suisse Bank Deferred Prosecution Agreement</u>

      xx.    On December 16, 2009, Credit Suisse AG, a Swiss corporation headquartered in Zurich,  pleaded to a Criminal Information and agreed to forfeit $536 million to the United States and to the New York County District Attorney's Office in connection with violations of the International Emergency Economic Powers Act (IEEPA) and New York state law.  Similar to the conduct of the other western Banks, Credit Suisse, beginning as early as 1995 and continuing through 2006, altered wire transfers involving U.S. sanctioned countries or persons.  Specifically, according to court documents, Credit Suisse deliberately removed material information, such as customer names, bank names and addresses, from payment messages so that the wire transfers would pass undetected through filters at U.S. financial institutions.  Credit Suisse also trained its Iranian clients to falsify wire transfers so that such messages would pass undetected through the U.S. financial system. This scheme allowed U.S. sanctioned countries and entities to move hundreds of millions of dollars through the U.S. financial system.

      xx.    The DPA specifically discusses that for its <u>Iranian </u>clients, Credit Suisse promised that no message would leave the bank without being hand-checked by a Credit Suisse employee to ensure that the message had been formatted to avoid U.S. filters. If an Iranian client provided payment messages that contained identifying information, Credit Suisse employees would remove the detectable information so that the message could pass undetected through OFAC filters at U.S.

financial institutions. According to court documents, Credit Suisse's international communications showed a continuous dialogue about the scheme, assessing how to better process Iranian transactions to ensure increased business from existing and future Iranian clients.

8.      Bank Saderat PLC Sanctions

xx.     The United States Treasury Department issued a press release dated September 8, 2006 in which announced that Iran's Bank Saderat is being cut off from all access to the U.S. financial system, direct or indirect.  Stuart Levey, Under Secretary for Terrorism and Financial Intelligence  stated  "It is remarkable that Iran has a nine-digit line item in its budget to support terrorism."

xx.     In a move to counter Iran's support for terrorism, the U.S. Department of the Treasury's Levey further announced that day that –

> "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly."

xx.     The Treasury Department further stated that Bank Saderat is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001.

xx.     The announcement further discussed that under the current Iranian Transactions Regulations (31 CFR Part 560), U.S. banks may process certain funds transfers involving an Iranian bank, such as transfers for authorized or exempt transactions and "U-turn" transactions.

U-turn transactions allow U.S. banks to process payments involving Iran that begin and end with a non-Iranian foreign bank. Bank Saderat will not be able to participate in any transfers involving U.S. banks, effective from the date that the amendment to the regulations is filed with the Federal Register early next week. By prohibiting U-turn and all other transactions with Bank Saderat, the bank is denied all direct and indirect access to the U.S. financial system.[1]

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### EACH DEFENDANT

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B AND 18 U.S.C. § 2333(a)

xx.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.     Each Defendant, as described above, knowingly provided support or resources to Iran in an illegal manner, and had knowledge, or acted with deliberate indifference  as to whether Iran (and its proxies) provided material support to foreign terrorist organizations, all in violation of 18 U.S.C. 2339(B)(a)(1).

xx.     Support and resources to Iran was provided by the Defendants herein (including Defendants John Does 1-50) by assisting Iran in concealing its financial activities knowing that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact

---

[1]

that Iran provided material support to terrorist organizations, such as patronage of Hezbollah and other FTOs.

xx.     This assistance was provided to Iran by the knowing transfer of hundreds of billions of dollars through the United States in a manner designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and as a result knowingly, or acting with deliberate indifference, facilitated the transfer of tens of millions of dollars in payments to Hezbollah, a designated foreign terrorist organization,  through the international financial system.

xx.     Each Defendant knew, or was deliberately indifferent to the fact that, Hezbollah was designated an FTO as described in 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2339B(g)(6), and acted  as Iran's proxy, agent, and strategic partner.

xx. The acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism under 18 U.S.C. § 2331(1) as they satisfy the conditions required under 18 U.S.C. § 2331(1)(A) and (B), thereby providing jurisdiction for this civil action under 18 U.S.C. §2333(a).

xx.     Each Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and foreseeably, substantially accelerated and multiplied Hezbollah's ability to engage in acts of international terrorism under the definition set forth in 18 U.S.C. § 2331(1). Each Defendant's conduct was thus also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

xx.     Through its conduct as described above, Defendants violated 18 U.S.C. § 2339B which is recognized as constituting acts of international terrorism, and each Defendant is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SECOND CLAIM FOR RELIEF

### EACH DEFENDANT

### CONSPIRACY TO COMMIT ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B AND 18 U.S.C. § 2333(a)

xx.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.     Each Defendant, as described above, knowingly agreed to provide support or resources to Iran,  with knowledge, or by acting with deliberate indifference, that Iran and its proxies provided material support to foreign terrorist organizations, all in violation of 18 U.S.C. 2339(B)(a)(1).

xx.     Defendants herein (including Defendants John Does 1-50) agreed with Iran to assist Iran in concealing its financial activities and violated 18 U.S.C. § 2339B by knowingly, or exhibited deliberate indifference to, the fact that Iran had, since 1984, been officially designated by the United States as a State Sponsor of Terrorism, subject to various U.S. sanctions, and knew or were deliberately indifferent to the fact that such designation was based in part on Iran's sponsorship and patronage of Hezbollah and other FTOs, and that Iran used Hezbollah as a primary mechanism to enable it to cultivate and support terrorism.

xx.     This assistance was part of a conspiracy in which each Defendant agreed with Iran to knowingly transfer of hundreds of billions of dollars through the United States in a manner expressly designed to purposefully circumvent monitoring by U.S. regulators and law enforcement agencies and evade U.S. sanctions; minimize the transparency of their financial activities; and as a result knowing that Iran supported designated terrorist organizations, agreed to facilitate the transfer of tens of millions of dollars in payments to Hezbollah, a designated foreign terrorist organization,  through the international financial system.

xx.     Each Defendant knew, or was deliberately indifferent to the fact, that, Hezbollah was designated an FTO as described in 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2339B(g)(6). Each Defendant knew or was deliberately indifferent to the fact that its agreement to provide Iran support in an illegal manner, and the overt acts it completed in connection with the conspiracy unlawfully evaded U.S. sanctions and regulations directed at mitigating the risk that Iran would carry out, support, fund, plan for, prepare, conspire with, or facilitate acts of international terrorism by FTOs, including acts planned, attempted, and perpetrated by Iran's proxy, agent, and strategic partner, Hezbollah.

xx.     Both the conspiracy itself and the acts of international terrorism that injured the Plaintiffs constitute acts of international terrorism as they satisfy the conditions required under 18 U.S.C. § 2331(1)(A) and (B).

xx.     Each Defendant also knew of the existence of other co-conspirators including some or all of the Defendants; was aware that the other co-conspirators (including Defendants and Iranian Bank co-conspirators) engaged in the same or similar conduct, and that the other coconspirators shared the objective of providing material support and services to Iran in an illegal manner for the explicit purpose of enabling Iran to avoid U.S. sanctions and regulations enacted specifically to prevent Iran's ability to finance, support, prepare for, plan, or carry out acts by FTOs including Iran's proxy, agent, and strategic partner, Hezbollah.

xx.     Each Defendant also knew or was deliberately indifferent to the fact that one of the specific aims and objectives of the conspiracy was to keep U.S. depository institutions, law enforcement and counter-terrorism agencies blind to Iran's movement of U.S. dollars through the international financial system, and thus also knew that the overt acts it performed in furtherance of the conspiracy facilitated that specific objective.

xx.      Each Defendant also knew or was deliberately indifferent to the fact that the conspiracy's aims would foreseeably result in Iran transferring millions of dollars to Hezbollah, an FTO.

xx.      Furthermore, each Plaintiff's injuries constitutes a harm falling within the risk contemplated by each Defendant's violations,.  Injuries resulting from terrorist attacks planned, designed, assisted, funded, initiated, and/or overseen by Hezbollah are precisely the risks contemplated by statutes, regulations and Executive Orders designed to ensure that Hezbollah's sponsor, principal, and strategic partner – Iran – had restricted access to U.S. dollars and financial services, and that any funds it did receive that touched U.S. depository institutions were transparent and could be blocked if warranted.

xx.      Through its conduct as described above, by knowingly agreeing with conspirators to violate 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, each Defendant committed acts of international terrorism (as defined in 18 U.S.C. § 2331(1)(A) (B) and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).


### THIRD CLAIM OF RELIEF

### ACTS OF INTERNATIONAL TERRORISM IN HSBC DEFENDANTS' VIOLATIONS OF 18 U.S.C. § 2332d (Financial Transactions)

xx.      Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.      Defendant HSBC-US is a "United States person" pursuant to 18 U.S.C. § 2332d(b)(2)(C), and pursuant to 18 U.S.C. § 2332d(b)(2)(D).

xx.     As alleged above, at all relevant times HSBC-US knew, or had reasonable cause to know, that Iran was a country designated by the United States under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism.

xx.     HSBC-US nevertheless engaged in thousands of financial transactions with Iran in violation of 18 U.S.C. § 2332d as Defendant HSBC-US knew that Iran provided massive support and sponsorship for other acts of international terrorism, such as those planned, attempted, and/or perpetrated by the designated FTOs including the Special Groups.

xx.     As alleged above, HSBC-US knowingly conducted illegal financial transactions on behalf of Iran through Bank Melli and other Iranian counter-parties that did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department – regulations passed for the specific purposes of mitigating the risk that funds transfers to Iran could be used to engage in acts of international terrorism under 18 U.S.C. § 2331.

xx.     The transactions at issue included at least the $183 million HSBC-US facilitated on behalf of sanctioned entities in Iran that were identified in HSBC-US's December 11, 2012 Deferred Prosecution Agreement with DOJ.

xx.     Defendant HSBC-US knew that Defendants HSBC-Europe and HSBC-Middle East were deliberately altering and omitting information in funds transfer payment order messages being processed through HSBC-US, thereby evading U.S. laws and regulations whose express purpose was (and is) to ensure that only a very limited class of payments could be facilitated to Iran, and that payment order messages for such funds transfers required transparency in order to ensure that the transfers qualified for the limited exceptions and exemptions, and did not result in U.S. depository institutions processing transactions for the

benefit of SDNs.

xx.     As alleged in detail above, throughout the relevant time period, HSBC-US knew that other HSBC Defendants such as HSBC-London and HSBC-Middle East were providing material support to Iran in a manner violating U.S. laws and regulations, and HSBC-US also knew its own systems and networks were being used to facilitate the HSBC Defendants' illegal conduct.

xx.     Defendant HSBC-US's knowing provision of illegal financial services to Iran, enabled Iran to move billions of U.S. dollars through the United States without those funds being monitored by U.S. regulators and law enforcement agencies and therefore involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

xx.     Through its conduct as described above, by violating § 2332d in the manner and with the state of mind alleged above, HSBC-US committed acts of international terrorism, and is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FOURTH CLAIM FOR RELIEF

## ACTS OF INTERNATIONAL TERRORISM BY DEFENDANTS' STANDARD CHARTERED BANK, ROYAL BANK OF SCOTLAND N.V. AND COMMERZBANK FOR VIOLATIONS OF 18 USC § 2332d

xx.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.     Defendants SCB, ABN Amro (RBS N.V.), and Commerzbank respective New York branches are each a "person in the United States" within the scope of 18 U.S.C. § 2332d(b)(2)(D).

xx.     As set forth above, each of the above-referenced Defendants knew or had reasonable cause to know Iran was designated under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405) as a country supporting international terrorism and nonetheless knowingly engaged in thousands of illegal financial transactions with the government of Iran through their U.S. operations.

xx.     As set forth above, the illegal transactions knowingly facilitated through New York by the respective New York branches of the above-referenced Defendants thus did not fall within the safe harbor provisions of the regulations issued by the U.S. Treasury Department for U-Turn exemption transactions, and therefore violated the criminal provisions of 18 U.S.C § 2332d(a).

xx.     Each of the above-referenced Defendant's New York branch knowingly, or with reasonable cause to know, provided financial services to Iran in the United States, knowing that its conduct enabled Iran to move millions (or in some cases, billions) of USD through the United States without those funds being monitored by U.S. regulators and law enforcement agencies. That conduct involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

xx.     Each of the above-referenced Defendants' violations of the provisions of 18 U.S.C. § 2332d(a) was a sufficient cause of Plaintiffs' injuries, and, for the reasons alleged in Plaintiffs' Third Claim for Relief against Defendant HSBC-US, constitutes "acts of international terrorism" rendering each of the above Defendants civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM (IRISL)

xx.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.     As described above, Defendant Commerzbank provided material support and resources, as that term is defined in 18 U.S.C. § 2339A(b)(1), to the IRGC through Commerzbank's acts on behalf of IRISL, which served as financial and logistical conduit for the IRGC and its terrorist activities.

xx.     Defendant Commerzbank knew or was deliberately indifferent that to the fact that the IRISL had been designated an SDN for Weapons of Mass Destruction-related activities that included arms shipments, including shipments destined for Hezbollah and other terrorists.

xx.     Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied the IRGC's ability to engage in terrorist activity and/or commit "acts of international terrorism" as that term is defined in 18 U.S.C. § 2331.

xx.     The material support that Commerzbank knowingly and illegally provided to the IRISL provided foreseeable, substantial assistance to the IRGC, Hezbollah and the Special Groups, and thus Commerzbank's conduct was also a substantial, foreseeable factor in bringing about the Plaintiffs' injuries.

xx.     Through its conduct as described above, by knowingly or with deliberate indifference, providing material support to Iran, the IRGC, and IRISL, and thereby violating 18

U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST COMMERZBANK AG UNDER 18 U.S.C. § 2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM (Orphans Project Lebanon E.V.)

xx.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.    Defendant Commerzbank violated § 2339B by providing material support and resources, as that term is defined in 18 U.S.C. § 2339A(b)(1), to Hezbollah through Commerzbank's acts on behalf of its customer Waisenkinderprojekt Libanon e.V. (Orphans Project Lebanon e.V), which served as financial and logistical conduit for the IRGC and its terrorist activities.

xx.    Commerzbank knew, or was deliberately indifferent to the fact, that Orphans Project Lebanon e.V. was transferring funds through Commerzbank to FTO Hezbollah and that Hezbollah would use that support in preparation for, or in carrying out, acts of international Terrorism.

xx.    Defendant Commerzbank's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity  and acts of international terrorism as that terms is defined in 18 U.S.C. § 2331(1)(A) and (B).

xx.    Through its conduct as described above, by knowingly or with deliberate

indifference, providing material support and resources to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Commerzbank is civilly liable for  damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## SEVENTH CLAIM FOR RELIEF

## CIVIL LIABILITY AGAINST STANDARD CHARTERED BANK UNDER 18 U.S.C. §2333(a) FOR VIOLATIONS OF 18 U.S.C. § 2339B CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

xx.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

xx.     Defendant Standard Chartered Bank provided material support and resources to the IRGC and its Qods Force, which are designated FTOs, through its acts on behalf of Mahan Air, MODAFL and other entities identified *supra* in violation of § 2339B by concealing and disguising the nature, location, source, and ownership of material support it provided to Mahan Air, MODAFL and other entities identified *supra.*

*xx.*  Defendant Standard Chartered Bank knew or was deliberately indifferent to the fact that the IRGC and its Qods Force would use that support in preparation for, or in carrying out, acts of international terrorism.

xx.  Defendant Standard Chartered Bank knew or was deliberately indifferent to the fact that Mahan Air, MODAFL and other entities identified *supra* were utilizing Letters of Credit facilitated by Standard Chartered Bank to evade U.S. sanctions and acquire materials used, *inter alia*, to effectuate arms shipments, transport weapons, personnel and technology to the IRGC-QF and Hezbollah.

xx.     Mahan Air did, in fact, transport weapons, personnel and technology into Iraq on

behalf of the IRGC-QF and Hezbollah and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

xx.     Defendant's conduct was a substantial cause in fact and a significant factor in the chain of events leading to the Plaintiffs' injuries, and substantially accelerated and multiplied Hezbollah's ability to engage in terrorist activity  and acts of international terrorism as that terms is defined in 18 U.S.C. § 2331(1)(A) and (B).

xx.     Through its conduct as described above, by knowingly or with deliberate indifference, providing material support and resources to Hezbollah, and thereby violating 18 U.S.C. § 2339B in the manner and with the state of mind alleged above, Defendant Standard Bank is civilly liable for  damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Enter judgment against the Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

(c) Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d) Enter an Order declaring that Defendants have violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.; and

(e) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: 11/2/2016

Respectfully submitted,

THE DRISCOLL FIRM, P.C.

By:      ___/s/John J. Driscoll_____
         JOHN J. DRISCOLL, #62764643
         211 N. Broadway, 40th Floor
         St. Louis, Missouri  63102
         314-932-3232 telephone
         314-932-3233 facsimile
         john@thedriscollfirm.com
         *Attorney for Plaintiffs*